SCOTT N. SCHOOLS (SCBN 9990)
United States Attorney

BRIAN STRETCH (CABN 163973)
Chief, Criminal Division

DENISE MARIE BARTON (MABN 634052)
Assistant United States Attorney

   450 Golden Gate Avenue, Box 36055
   San Francisco, California 94102
   Telephone: (415) 436-7359
   Facsimile: (415) 436-7234
   denise.barton@usdoj.gov

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | CR No. 07-425 PJH |
|     Plaintiff, ) | **UNITED STATES' SENTENCING MEMORANDUM** |
|     v. ) | |
| CHARKON CHANSAEM, ) | Date: October 10, 2007, 1:30 pm<br>The Honorable Phyllis J. Hamilton |
|     Defendant. ) | |

## I. INTRODUCTION

The facts of this case are simple, but disturbing. On March 23, 2007, the defendant, Charkon Chansaem, transported ten CD-ROMs containing still and video images of child pornography depicting the abuse and molestation of children, many of whom were prepubescent, into the Northern District of California from Thailand. After knowingly waiving his Miranda rights, the defendant admitted to federal agents in precise detail that the CD-ROMs found in his luggage belonged to him; that he bought the CD-ROMs at a market in Thailand; that he knew that the CD-ROMs contained child pornography when he bought them; and that he knew that child pornography was illegal in the United States.

The defendant now faces sentencing on a one count Information charging Transportation of Child Pornography in violation of Title 18, United States Code, section 2252(a)(1). The Government disagrees with the sentencing recommendation or the Probation Department and submits that a mid-range sentence of incarceration of 70 months is "sufficient, but not greater than necessary" to effect the purposes of sentencing for the reasons set forth below. See 18 U.S.C. § 3553(a).

## II. FACTUAL BACKGROUND

A. The Defendant Traveled to the United States With Child Pornography

On March 23, 2007, the defendant arrived at San Francisco International Airport from Thailand via Japan. When the defendant cleared the Immigration and Customs area at the airport, he left the area without his luggage. Upon receiving the defendant's unclaimed luggage, Customs and Border Protection (CBP) agents conducted a border inspection on the unclaimed luggage and found CD-ROMs with suspected child pornography. After a short time, the defendant returned for his luggage and told CBP agents that the unclaimed luggage belonged to him. CBP referred the matter to Immigrations and Customs Enforcement (ICE).

After waiving his *Miranda* rights, the defendant spoke with ICE agents.[1] He said that he knew the videos found in his luggage were illegal and were "not permitted" in the United States and that was the reason he was being questioned. The defendant stated that he entered the country to work onboard a Princess Cruise Lines cruise ship that was departing from Los Angeles.[2] The defendant said that other crew members on the cruise ship swap pornography movies and had asked him to bring some videos from Thailand. When asked if crew members shared child pornography, the defendant said that he did not think that others were interested in child pornography. The defendant did not respond when asked why he brought child

---

[1] According to the agent before whom the defendant waived his *Miranda* rights, the defendant read and spoke English fluently. Further, the defendant told agents that he began speaking English in Thailand in elementary school; continued his English studies through high school and University; and began speaking English fluently at age 28.

[2] Upon entry, the defendant had a valid C-1/D seamen's visa.

UNITED STATES' SENTENCING MEMORANDUM- CR No. 07-425 PJH

2

pornography for the crew members if they were not interested in child pornography.

The defendant told the ICE agents that he bought the child pornography videos at a marketplace in Thailand. The defendant said that child pornography videos are illegal in Thailand and that the police will arrest you for buying or selling child pornography videos. The defendant said that to buy child pornography videos, you must have a personal connection. He explained that he bought the CD-ROMs in question through a friend named "Joe LNU," who he claims to have known for three years. The defendants said that he had asked Joe to find him "porn of white girls." According to the defendant, Joe made an appointment to get the porn; he and Joe went to the market; Joe spoke with the salesperson; she picked out some CDs and gave them to Joe in a bag. While at the market, Joe gave the defendant the CDs and the defendant paid the salesperson approximately $1 per CD-ROM. The defendant said that the CD-ROMs he purchased at the market were the same ones found in his luggage.

The agents found ten CD-ROMs containing still and video images of child pornography in the defendant's luggage. One CD-ROM was labeled "My Disc" or "My Dise." Nine of the CD-ROMs appeared to be commercial CDs. The outside covers of these CD-ROMs had photographs of child pornography on the front and back covers as described below. The defendant was asked about the age of children in the photographs on some of the covers and made the statements noted below.

- CD-ROM, labeled *"Hustler Video 002 Baby Sexy."* The front cover of this CD-ROM depicts a girl, appearing to be approximately 13-14 years old, nude from the waist down, exposing her vaginal area. When asked about the photograph on the cover of the CD-ROM, the defendant stated that he believed the girl was approximately 15 years old. The back cover shows several photographs of the vaginal areas of young girls, each posed in a sexual explicit manner.

- CD-ROM, labeled "*Hustler Video 003 Baby Sexy.*" The front cover of this CD-ROM depicts a young girl with her breasts exposed. The defendant stated that he believed the girl on the cover was 16-17 years old. The back cover contains photographs of several young girls, with their legs spread or breasts exposed in a sexually explicit manner. Some of the photographs on the back cover depict the penis of an adult male being inserted into the vagina of a young girl.

- CD-ROM, labeled "*Hustler Bangkok 004*." The front cover of this CD-ROM shows a girl, who appears to be approximately 7 years old, naked except for a cloth wrap around her waist area, exposing her breast area and vagina. The

defendant stated that he believed the girl on this CD-ROM was approximately 7 years old. The back cover shows photographs depicting the vaginal area of young girls.

- CD-ROM labeled "*Hustler Island 005*." The cover of the CD-ROM depicts a partially nude girl, who appears to be approximately 7 years old, posed in a sexually explicit manner. The defendant stated that he believed the girl to be approximately 10 years old. The back cover shows photographs depicting naked young girls; manual stimulation by a young girl on an adult male penis; and sexual intercourse between an adult male and young girl.

- CD-ROM labeled "*Hustler Video 006 Baby Sexy*." The front cover of this CD-ROM depicts a young girl, who appears to be 6-8 years old. The back cover has photographs of three naked girls, who appear to be 7-11 years old, exposing their vaginal areas and posed in sexually explicit manners. The defendant stated that one of the girls on the cover was approximately 6-7 years old. The defendant also stated that the Thai writing on the CD-ROM cover translates to "Bad Child."

- CD-ROM labeled "*Hustler Video 007 Baby Sexy*." The front cover photograph of this CD-ROM depicts a girl, who appears to be approximately 10-12 years old, posed in a sexually explicit manner. The back cover contains photographs depicting nude young girls, and cropped photographs of the exposed vaginas of young girls. The defendant stated that he believed the girl on the front and back covers to be approximately 15-16 years old.

- A CD-ROM labeled "*Hustler Video 008 Baby Sexy*." The front cover photograph depicts a nude girl, who appears to be approximately 9-10 years old, posed in a sexually explicit manner. The defendant stated that he believed the girl on the cover to be approximately 9-10 years old. The back cover contains several photographs that depict an adult male having sexual intercourse with a young girl who appears to be grimacing in pain; an adult penis being inserted into a girl's vagina; and a girl performing oral copulation on an adult male.

- CD-ROM labeled "*Hustler Video 010 Baby Sexy*." The front cover of this CD-ROM depicts a partially nude girl, who appears to be approximately 12 years old, posed in a sexually explicit manner, holding a whip or crop. The defendant stated that he believed the girl to be 11-12 years old. The rear cover contains cropped photographs of an adult male inserting his penis into a girl's vagina, and in other photographs, an adult male inserting an object into a girl's vagina.

- CD-ROM labeled "*Hustler Video 011 Baby Sexy*." The front cover of the CD-ROM depicts a partially nude girl, who appears to be approximately 14 years old, posing in a sexually explicit manner. The defendant stated that he believed the girl on the cover to be 20 years old. The back cover contains several photographs of young girls exposing their vaginal areas.

B.  The Child Pornography on the CD-ROMs Transported by the Defendant

Insofar as the Court has reviewed the images and videos at issue, the United States has not included a description of each images in this Memorandum. However, to the extent it will aid the Court at sentencing, a brief description of the child pornography images on each CD-ROM is attached at Exhibit A.

UNITED STATES' SENTENCING MEMORANDUM- CR No. 07-425 PJH

4

### III. CONTEXT FOR SENTENCING

As the Court is well aware, the Sentencing Guidelines are no longer binding in the wake of the Supreme Court's decision in *Booker*. As set forth in *United States v. Mix*, 457 F.3d 906, 911 (9th Cir. 2006), the district court must correctly analyze the Guidelines and then take into account the factors set forth in section 3553. Although the Guidelines are not binding, "it is fair to assume that the Guidelines, insofar as practicable, reflect a rough approximation of sentences that might achieve section 3553(a)'s objectives." *United States v. Rita*, 127 S. Ct. 2456, 2464 (2007). Those factors include:

(1) The nature and circumstances of the offense and the history and characteristics of the defendant;

(2) The need for the sentence imposed
  (A) To reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
  (B) To afford adequate deterrence to criminal conduct;
  (C) To protect the public from further crimes of the defendant; and
  (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) The kinds of sentences available;

(4) The kinds of sentence and the sentencing range established for
  (A) The applicable category of offense committed by the applicable category of defendant as set forth in the Guidelines (I) issued by the Sentencing Commission . . .

(5) Any pertinent policy statement -
  (A) Issued by the Sentencing Commission . . .

(6) The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) The need to provide restitution to any victims of the offense.

The statutory minimum term of imprisonment that the defendant faces is five years imprisonment, and the maximum term of imprisonment is twenty years. The maximum term of supervised release is "life," the maximum fine that can be imposed is $250,000. There is a mandatory special assessment of $100 for each count. The parties and the Probation Office agree that the applicable Guideline range is Adjusted Offense Level 26. The United States agrees that the defendant's Criminal History Category of I and the applicable Guideline range is 63-78 months.

UNITED STATES' SENTENCING MEMORANDUM- CR No. 07-425 PJH

**IV. THE GOVERNMENT'S POSITION**

The Court should sentence the defendant to a term of imprisonment of 70 months followed by a term of supervised release of ten years with the conditions recommended by the Probation Officer.  The Probation Office has recommended a 60 month sentence, a sentence below the range agreed to by the parties and a departure from the low-end of the relevant guideline range.  The United States believes that this sentence would under-represent the seriousness of the defendant's conduct, disregard the nature and circumstances of this offense, minimize the seriousness of this offense, and therefore be an inadequate punishment. Sentencing the defendant to the low-end of the Guidelines ignores the victimization of the many children depicted in these images, defendant's efforts to bring child pornography into the United States for his own aberrant pleasure, and defendant's current efforts to minimize the criminality of his conduct.  Defendant's current position, in minimizing his culpability, is precariously close to failing to accept responsibility, which in the Plea Agreement, entitled him to a 3 point adjustment.  Although standing by the Plea Agreement, the United States suggests that this Court should consider the defendant's failure to fully accept first, responsibility for his actions, and second, acknowledge the impact and seriousness of his conduct.  The government's recommended sentence is a  reasonable and appropriate disposition of the matter; falls with the applicable Guidelines range; and properly accounts for the defendant's criminal conduct and the section 3553 factors.

    A.  <u>Defendant's Current Efforts to Minimize His Culpability for the Crime and Failure to Accept Responsibility for His Conduct</u>

Now, having waived his constitutional right to challenge the statement he made to Immigration and Customs Enforcement Agents, the defendant claims, in stark contrast to the specific and detailed statement he made to agents that he did not know that his conduct was illegal.  In essence, defendant is now claiming that the case agent fabricated the specific and detailed statement set forth in the *Report of Investigation of Senior Special Agent Brian Kawabata, dated March 24, 2007.  See infra at IIA*.  As set forth above, the defendant gave a statement with specific details to Special Agent Kawabata.  It is preposterous for the defendant to

now claim that due to his purported language inadequacies, the case agent misunderstood what he said. If there had been confusion or fabrication, wouldn't the report have been a summary, boilerplate statement, not the precise and specific actions and statements described by the agent? The defendant's argument should be regarded for what it is - last ditch and baseless efforts to impugn the work of a conscientious agent and detract from the fact that this defendant expended a significant amount of time, effort, and knowing risk in acquiring and transporting these images from Thailand into the United States. To the extent that the Court credits defendant's specious claim that he was not aware that the images were illegal, this claim should have no impact on sentencing. As defense counsel is well aware, the United States has no obligation to prove that the defendant knew that his conduct is illegal. *United States v. Moncini*, 882 F.2d 401, 404-05 (9th Cir. 1989) (government has no obligation to prove that the defendant knew that his mailing of child pornography was illegal).

Even if the defendant did not know that possessing these images was illegal, at a minimum, the defendant's conduct was amoral, universally unacceptable, and aberrant. It is preposterous to believe that the defendant thought it was appropriate or acceptable to possess videos of prepubescent children being molested by anal, vaginal, and oral penetration. Defendant acquired images of children being molested for his own prurient and selfish interests, without regard to the victimization of the children depicted. In sentencing this defendant, the Court should consider, in accordance with the Section 3553 factors, the defendant's failure to acknowledge the seriousness of the offense, impact on the victims, and respect for the law.

B. Congress Has Repeatedly Stated That Penalties for the Offenses Committed by the Defendant Should Be Harsh.

The defendant is in the general population of sexual offenders that have been deemed worthy of significant federal punishments. The Court is aware of the relatively recent statutory and sentencing guideline amendments that have strengthened the federal penalties for offenses related to the sexual exploitation of minors. Approximately four years ago Congress enacted the Prosecutorial Remedies and Other Tools to End the Exploitation of Children Today Act of 2003

1  (the PROTECT Act, Public Law 108-21) in large part to enhance the penalties for crimes
2  involving the sexual exploitation of children.  As justification for higher sentences in child
3  exploitation offenses, Congress stated:

4  (2) "The Government has a compelling state interest in protecting children from those who sexually exploit them, including both child molesters and child pornographers."  'The prevention of sexual exploitation and abuse of children constitutes a government objective of surpassing importance,' New York v. Ferber 458 U.S. 747 (1982).

7  *The Protect Act, Title V. - Obscenity and Pornography, Sec. 501. Findings*.

8  In the case of child exploitation prosecutions, the government has a compelling interest to
9  protect children from those who would exploit them.  The defendant is the very type of offender
10 that Congress contemplated when it drafted and enacted the PROTECT Act.  The federal child
11 sexual exploitation statutes and penalty provisions are designed to provide just punishment for
12 the offenses that the defendant has committed.
13 More recently, on July 27, 2006, Congress enacted the Adam Walsh Child Protection and
14 Safety Act of 2006, H.R. 4472.  This new legislation created new offenses related to the sexual
15 exploitation of minors and increased punishments for some existing offenses. It is worth noting
16 the continued Congressional focus on enacting additional legislation to enhance the protection of
17 children from those would use the internet to exploit them.[3]  The government provides this
18 context to suggest that the trend has been to do everything possible to increase punishment for
19 crimes like the offense for which the defendant now faces sentencing.  This reflects the societal
20 concern that crimes connected to the sexual exploitation of children are some of the most heinous
21 that can be committed.

C. A Mid-Range Sentence Recognizes the Seriousness of the Impact of This Crimes on the Victims

24 Congress understood that the children used in the production of child pornography were
25 the "primary victims" when it passed legislation prohibiting the sexual abuse and exploitation of

---

[3] The Court can also take notice that California's Proposition 83, which provides for lifetime global positioning system monitoring and restrictions on where registered sex offenders can reside, was approved by an overwhelming 70-30% majority of voters on November 7, 2006.

UNITED STATES' SENTENCING MEMORANDUM- CR No. 07-425 PJH

children through pornographic means. *United States v. Boos*, 127 F.3d 1207, 1210 (9th Cir. 1997). Congress' legislative history for Title 18, United States Code, section 2252 states that the statute "was born out of a 'deep and abiding concern for the health and welfare of the children and youth of the United States,' and was enacted in order 'to protect and benefit such children.'" *Id.* at 1211 (citing S. Rep. No. 95-438, at 40 (1977), *reprinted in* 1978 U.S.C.C.A.N. 40, 43).

The Senate Report specifically condemned what it saw as "base and sordid activities *which may permanently traumatize and warp the minds of the children involved*." *Id.* Continuing, the Report elaborated that "encounters [of child pornography] cannot help but have a deep psychological, humiliating impact on these youngsters and jeopardize the possibility of healthy, affectionate relationships in the future." *Id.* Finally, the Report referred on numerous occasions to child pornography as a "form of child abuse." *Id.*

In passing the PROTECT Act, Congress undertook its lawful duty to protect the psychological, emotional, and physical development of the nation's children. As the Supreme Court has stated, "A democratic society rests, for its continuance, upon the healthy, well-rounded growth of young people into full maturity as citizens." *Ferber*, 458 U.S. at 757. Therefore, the Supreme Court has declared that it "will generally sustain legislation aimed at protecting the physical and emotional well-being of children even when the laws . . . operate in sensitive areas." *Id.* Additionally, the Supreme Court has acknowledge the compelling governmental interest in stamping out child pornography at all levels. *Osborne*, 495 U.S. at 108-11.

This was not the first time Congress recognized the damaging social effects that child pornography is having on society's children. In the *Child Pornography Prevention Act of 1996* (hereinafter "CPPA"), Congress recognized that the production of child pornography "is a form of sexual abuse which can result in physical or psychological harm, or both, to the children involved" since it creates a permanent record of the child's abuse, allowing for continued victimization of that child. S. Rep. 104-358 § 2 (1)(2) (1996).

Indeed, the Senate report found that the "sexualization of minors creates an unwholesome environment which affects the psychological, mental and emotional development of children and undermines the efforts of parents and families to encourage the sound mental, moral and

1  emotional development of children." *S. Rep. No. 104-358, § 2 (11)(B)*.  The Senate therefore
2  concluded that there is a "compelling government interest for prohibiting the production,
3  distribution, sale, or viewing of visual depictions of children engaging in sexually explicit
4  conduct . . . ." *S. Rep. No. 104-358, § 2 (13)*.

5       The "use of children as subjects of pornographic materials is harmful to the physiological,
6  emotional, and mental health of the child" used in the production of the pornographic material.
7  *Osborne*, 495 U.S. at 109.  The Sixth Circuit has likewise held that using children to produce
8  graphic sexual images is a form of sexual abuse which can cause mental and/or physical harm to
9  a child.  *United States v. Champion*, 248 F.2d 502, 506 (6th Cir. 2001).  As previously noted,
10 "[t]he 'victimization' of the children involved does not end when the camera is put away."
11 *United States v. Norris*, 159 F.3d 926, 929 (5th Cir. 1998).  Additionally, viewing and collecting
12 these images, which depict children involved in sexual acts, contributes indirectly to the harm
13 inflicted on that child by creating a demand for more of the images.  These viewers contribute to
14 the cycle of abuse and are in part responsible for the psychological and physical harm of the
15 children used to produce the images.  *United States v. Yeaple*, 605 F. Supp. 85, 86 (Pa. D. 1985),
16 *see also, Ferber*, 458 U.S. at 759.

17      The consumer of sexual images causes children of pornographic abuse to suffer in various
18 ways: (1) the abuse is perpetuated through dissemination, (2) the existence of the image is an
19 invasion of the child's privacy, and (3) the demand for the creation of more images is created by
20 the consumer.  *Norris*, 159 F.3d at 929-30.  "Child pornography invariably produces great shame
21 and guilt in the children involved, especially as they get older and more fully comprehend the
22 enormity of their abuse and know that there is a permanent record of the degradation out there,
23 circulating around for people to see – maybe future friends or their own children when they grow
24 up."  Dr. Victor B. Cline, *Pornography's Effects on Adults & Children*, Morality in Media, 12
25 (2001).

26      When Congress enacted the CPPA, it found that the mere existence of pornographic
27 materials containing children, as well as their distribution, "creates the potential from many types
28 of harm in the community and presents a clear and present danger to all children; and it inflames

UNITED STATES' SENTENCING MEMORANDUM- CR No. 07-425 PJH
10

the desires of child molesters, pedophiles, and child pornographers who prey on children" which leads to the abuse and exploitation of children as creation and production of additional pornographic material is needed. *S. Rep. No. 104-358, § 2.* Indeed, this is why Congress found that "every instance of viewing images of child pornography represents a renewed violation of the privacy of the victims and a repetition of their abuse." *See Pub.L 109-248, Title V, Section 501, 120 Stat. 623 (2006)*.

## V. CONCLUSION

A mid-range sentence of 70 months imprisonment reflects the seriousness with which Congress and the Sentencing Commission view the offense that the defendant has committed and appropriately takes into account factors that the Court must consider under Title 18, United States Code, section 3553(a). The sentence imposed in this action should be substantial in order to adequately reflect the seriousness of the offenses, promote respect for the law, provide just punishment for the offenses, deter further criminal conduct, protect the public from further crimes of the defendant, and provide the defendant with needed correctional treatment.

DATED: October 4, 2007				Respectfully submitted,

						SCOTT SCHOOLS
						United States Attorney


						_____/s/_____
						DENISE MARIE BARTON
						Assistant United States Attorney